JOHN C. ELLSWORTH,

        Plaintiff,

     v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

        Defendant.

No. 15 CV 10268

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff John C. Ellsworth worked as a truck driver until he suffered a stroke. After the stroke, he experienced shortness of breath, migraine headaches, weakness, numbness, and other issues. He applied for Social Security disability insurance benefits and supplemental security income, and after his applications were denied, he requested a hearing. An Administrative Law Judge found that Ellsworth was not disabled, and the Appeals Council denied his request for review. Ellsworth filed this action and moves for summary judgment, seeking reversal of the decision and remand of the case to the ALJ. Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, filed her own motion for summary

---

[1] The current Acting Commissioner of Social Security is Nancy A. Berryhill. The Clerk shall substitute Berryhill for her predecessor, Carolyn W. Colvin, as defendant in this case. *See* Fed. R. Civ. P. 25(d).

judgment in response, requesting that the decision be affirmed. Ellsworth did not respond or reply.[2] For the reasons stated below, the decision is affirmed.

## I.    Legal Standards

Judicial review of decisions of the Social Security Administration is governed by 42 U.S.C. § 405(g). *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citation omitted). When the Appeals Council denies a claimant's request for review, "the ALJ's ruling is the final decision of the Commissioner of Social Security." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010) (citing *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009)). In such a case, "the district court examines the ALJ's decision to determine whether substantial evidence supports it and whether the ALJ applied the proper legal criteria." *Allord*, 631 F.3d at 415 (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014)). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). While deferential, this standard of review does not require the court to "scour the record for supportive evidence or [search] for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between

---

[2] Ellsworth's reply in support of his motion for summary judgment was due on November 28, 2016. He did not file a brief, and he did not ask for an extension of time or for further briefing on either his or the Commissioner's motion for summary judgment. Ellsworth has forfeited any arguments in response or reply to the Commissioner's brief. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 & n.1 (7th Cir. 2011).

that evidence and the ultimate determination." *Moon*, 763 F.3d at 721 (quoting *Moore*, 743 F.3d at 1121). Upon review, the court can "affirm, reverse, or modify the [ ] decision, with or without remanding the case for further proceedings." *Allord*, 631 F.3d at 415 (citation omitted).

## II.  Background[3]

Plaintiff John C. Ellsworth has a GED and was 48 years old at the time of the hearings. A.R. 43. He managed a convenience store in 1998, after which he worked as a truck driver until August 2, 2011. A.R. 47. On that day, he went to the hospital complaining of slurred speech, blurred vision, numbness in his right hand, and weakness. A.R. 345. Doctors diagnosed him with a stroke, but he left that hospital against medical advice and went to the Howard Community Hospital to be closer to his family. A.R. 345. At Howard, Dr. Deshini Moonesinghe examined Ellsworth and reported that he had had a cerebrovascular accident (*i.e.*, a stroke) and experienced blurred vision and difficulty talking. A.R. 345–48. She also reported that Ellsworth denied at the time experiencing weakness, shortness of breath, difficulty walking or swallowing, or a headache, though he said he did have a history of frequent headaches. A.R. 345–48. Tests also confirmed that Ellsworth had an atrioseptal

---

[3] The facts are taken from the administrative record, as identified in the parties' briefs. Ellsworth filed a Local Rule 56.1 statement of material facts, and the Commissioner did not respond to that statement. Ordinarily, a failure to controvert the material facts submitted by the moving party would result in the admission of those facts. LR 56.1(b)(3)(C). But Ellsworth does not refer to the statement of material facts in his memorandum, citing to the administrative record instead. I follow suit and will disregard the statement of material facts and cite to the administrative record.

defect,[4] which may have been a cause of the stroke. A.R. 351. On August 10, Ellsworth underwent a procedure to correct the defect. A.R. 343–44.

Two days later, Ellsworth saw Dr. Rafik S. Farag at Community Health Center in Peru, Indiana. A.R. 379. Dr. Farag noted that Ellsworth was experiencing slurred speech and a mild loss of movement in his right hand, but that the results of his neurological examination were otherwise normal, along with those of his cardiovascular and other physical examinations. A.R. 379–80. Dr. Farag diagnosed Ellsworth with an "unspecified speech and language deficit due to cerebrovascular disease," "unspecified cerebral artery occlusion with cerebral infarction," anxiety, a sleep disorder, and an "unspecified congenital defect of septal closure." A.R. 380. One month later, Ellsworth returned complaining of daily headaches, pain in his right arm, and weakness. A.R. 377. Dr. Farag noted that his general physical examination yielded normal results, and did not discuss the headaches or explicitly prescribe any treatment for them. A.R. 377–78. On November 7, 2011, Dr. Farag examined Ellsworth again and recorded normal results, but his notes do not discuss a neurological examination. A.R. 375.

On April 9, 2012, Ellsworth went to a speech pathologist, Lane S. Schmitt. Schmitt reported that Ellsworth complained of fatigue, weakness in his right arm, poor vision, and difficulty swallowing, but that his biggest concerns were his speech and language problems and migraines. A.R. 416–17. According to Schmitt, Ellsworth told her that he spent his days doing household chores and lawn tasks,

---

[4] The ALJ and the parties seem to use this term interchangeably with "atrial septal defect."

but took frequent breaks due to physical and mental fatigue. A.R. 416. Schmitt administered several tests to evaluate his speech and found that he had mild anomic aphasia, mild dysfluency, and mild stuttering. A.R. 28, 416–19. She concluded that he was "a functional but imperfect communicator." A.R. 419.

The next day, Ellsworth saw Dr. Zakir Khan, a consultative examiner. A.R. 421. Dr. Khan noted that Ellsworth complained of fatigue, poor vision, and weakness on his right side. A.R. 421–22. Ellsworth also reported that he had a history of chronic headaches and migraines, but denied having difficulty swallowing, swollen or painful joints, or other problems. A.R. 421–22. Dr. Khan examined Ellsworth and opined that he had weakness in his right leg, but that the results of his physical examination were otherwise normal. A.R. 422–23. He diagnosed him with the following conditions: right-sided weakness following a stroke, status post-atrial-septal-defect that had been closed, and headache syndrome. A.R. 423. Dr. Khan concluded that Ellsworth would not be able to stand, walk, or lift for extended periods of time, but could sit, carry and handle objects, hear, speak, and travel. A.R. 423.

In May 2012, Ellsworth saw Dr. Christopher O. Harper. A.R. 427. The record does not include treatment notes from Dr. Harper, but he submitted a letter stating that Ellsworth suffered from anxiety, fatigue, mild speech difficulties, weakness in his right arm and leg, numbness in his left leg, difficulty walking, and daily, incapacitating headaches. A.R. 427. According to Dr. Harper, "headaches are a well-known phenomenon in some stroke [patients] and his are currently out of control."

A.R. 427. Dr. Harper opined that Ellsworth could not work until his headaches were treated or he could be sufficiently trained for a new job. A.R. 427.

On July 18, 2013, Ellsworth testified before the ALJ. He was represented by counsel (though not the same attorney who represents him now), and testified that he had incapacitating migraines every week, and sometimes as many as four per week, as well as anxiety, shortness of breath, weakness, sensitivities to sunlight and vibrations, and difficulty walking, swallowing, focusing, and sleeping. A.R. 75–76. He also testified that his migraines exacerbate problems with his vision, speech, and breathing, and that he has to take multiple breaks and naps throughout the day. A.R. 75–76. Ellsworth said that he had no insurance and had been unable to afford to see his doctors in 2013, and that he had been taking only over-the-counter drugs to treat his headaches. A.R. 50, 64. The ALJ continued the hearing so that Ellsworth could be examined by a consulting neurologist for an updated assessment of his condition. A.R. 66.

On October 31, 2013, Ellsworth saw consulting neurologist Dr. Eston G. Norwood. A.R. 554 According to Dr. Norwood's report, Ellsworth said that he suffered from daily, dull headaches, and more intense headaches lasting from a few hours to a few days every week or two, but that he was not taking any medication. A.R. 554. He also complained of right-sided numbness and weakness, blurred vision, and speech and language problems. A.R. 554. Dr. Norwood reviewed Ellsworth's medical records, conducted a series of tests, and concluded that Ellsworth had some numbness in his right limbs, but found no speech problems, no problems with

walking, only minimal evidence of right-sided weakness, and no other evidence of neurological impairment. A.R. 554. Dr. Norwood opined that Ellsworth could not stand or walk for more than one hour at a time, but had no postural or environmental limitations. A.R. 556–57. The ALJ proffered to Ellsworth Dr. Norwood's report on November 4, 2013 (A.R. 319), and Ellsworth responded by requesting a second hearing and that Dr. Norwood be subpoenaed for that hearing. A.R. 324.

Before the second hearing, however, Ellsworth saw Dr. Harper for a second time, and Dr. Harper issued another medical opinion on February 18, 2014. A.R. 567. Dr. Harper wrote that Ellsworth's walking and speech problems had gotten better, but that he still suffered from fatigue and daily, incapacitating headaches that sometimes "crescendo," causing his other stroke-related symptoms to worsen. A.R. 567. Dr. Harper also reported that Ellsworth had difficulty swallowing. A.R. 567. Dr. Harper again explained that stroke victims often experience chronic headaches that are resistant to treatment. A.R. 567. And he opined that Ellsworth was on medication for his headaches that was insufficiently effective but had certain, limiting side effects. A.R. 567. Dr. Harper also noted that a recent MRI exam showed damage in Ellsworth's brain consistent with a stroke and which "fits his disability claims." A.R. 567. Dr. Harper concluded that Ellsworth was permanently disabled. A.R. 567.

At the second hearing on March 5, 2014, Ellsworth testified that most of his symptoms had not changed in the preceding year, but that his headaches had

gotten worse. A.R. 77. He said again that he needed to lie down and rest several times a day. A.R. 80. He also testified that Dr. Harper had prescribed new medication for him, but that he did not know if the medication would be effective, because he could not afford to fill his prescriptions. A.R. 77–81. Instead, he continued to take over-the-counter drugs for his headaches. A.R. 80.

Vocational expert David Head also testified at the hearing. The ALJ asked the vocational expert if jobs exist for someone who could perform only sedentary work with certain postural and environmental limitations. A.R. 83. The vocational expert replied in the affirmative, providing statistics on available jobs. A.R. 83–84. The ALJ then asked if Ellsworth could perform those jobs if Ellsworth's "subjective testimony" were to be believed. A.R. 84. Noting that Ellsworth had complained of severe migraines that prevented him from doing anything other than lie down, the vocational expert testified that, were the subjective testimony to be credited, Ellsworth's estimated absenteeism would exceed the acceptable level for the types of work he had identified. A.R. 84–85.

On May 20, 2014, the ALJ issued a written decision discussing Ellsworth's testimony and the medical records and opinions (including the opinions of non-examining doctors Robert Estock, B. Randall Horton, and Arvind Chopra) and denying disability benefits. Ellsworth requested that the Appeals Council review the decision, but that request was denied. Ellsworth seeks judicial review.

## III.   Analysis

Under the Social Security Act, a person is disabled if he is unable "to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). In five steps, the ALJ considers whether the claimant: (1) is currently performing substantial gainful activity (if so, the claimant is not disabled); (2) has a severe impairment or combination of impairments (if not, the claimant is not disabled); (3) has an impairment that is equal to an impairment specifically listed in the regulations (if so, the claimant is disabled); (4) can perform her past relevant work (if so, the claimant is not disabled); and (5) can perform other work that exists in the national economy (if so, the claimant is not disabled). 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The ALJ performs those steps sequentially (20 C.F.R. §§ 404.1520(a), 416.920(a)), but before proceeding to steps four and five, he must determine the claimant's "residual functioning capacity," which is "what an individual can still do despite his or her limitations." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014). "The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ conducted the five-step analysis and found first that Ellsworth had not engaged in substantial gainful activity since August 2, 2011. At step two, he found that Ellsworth had the following severe impairments: atrial septal defect, late

effects of cerebrovascular disease, and arthropathy. But the ALJ determined at step three that the impairments or combination of impairments were not equivalent to any impairment specifically listed in the regulations. The ALJ found that Ellsworth had the residual functional capacity to perform sedentary work involving simple one- and two-step procedures with certain limitations—he could occasionally stoop, kneel, crouch, and climb, but could not climb ladders, ropes, or scaffolds, and could not crawl. He could frequently balance, but could not work around unprotected heights, operate a motor vehicle, or operate dangerous machinery, and he could not work in a job that had production quotas. Based on Ellsworth's residual functional capacity, the ALJ determined at step four that Ellsworth could not perform any past relevant work. But at the final step, the ALJ found that, considering Ellsworth's age, education, work experience, and residual functional capacity, a significant number of jobs exist in the national economy that Ellsworth could perform. The ALJ concluded that Ellsworth was not disabled under the Social Security Act.

Ellsworth claims that the ALJ erred in determining Ellsworth's residual functional capacity, which resulted in an erroneous finding that Ellsworth could work despite his severe impairments. Specifically, Ellsworth argues that the ALJ improperly credited the medical opinion of one physician while improperly discounting the opinion of another, and failed to adequately explain his assessment of Ellsworth's credibility. Ellsworth also argues that the ALJ did not properly

evaluate the vocational expert's testimony, and that Ellsworth qualifies for disability benefits based on conditions that arose after the ALJ's decision.

## A.    Dr. Norwood

The ALJ assigned "great weight" to Dr. Norwood's medical opinion, the substance of which was adverse to a finding of disability. As explained above, Dr. Norwood found some evidence of numbness and weakness, but ultimately concluded that Ellsworth did not have environmental or postural limitations that would prevent him from working. Ellsworth argues that the ALJ should not have given significant weight to that opinion or considered it at all, because the ALJ denied, without explanation, Ellsworth's request to subpoena Dr. Norwood, violating applicable guidelines and depriving Ellsworth of the opportunity to cross-examine him at the hearing.

An ALJ may issue a subpoena "[w]hen it is reasonably necessary for the full presentation of a case." 20 C.F.R. §§ 404.950(d)(1), 416.1450(d)(1). "The party requesting the subpoena must 'state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena.'" *Butera v. Apfel*, 173 F.3d 1049, 1057 (7th Cir. 1999) (quoting 20 C.F.R. §§ 404.950(d)(2), 416.1450(d)(2)). Ellsworth requested that the ALJ issue a subpoena to Dr. Norwood for his in-person testimony and records, stating that "Dr. Norwood's testimony and records are necessary to determine the procedures utilized during the examination, the time spent with the claimant and the rational[e] behind the doctor's recommendations." A.R. 324. The ALJ did not

issue the subpoena, which Ellsworth says is an effective denial of his request, but the ALJ did not explain his reasons for that denial. At the hearing, the ALJ asked Ellsworth's counsel if she objected to the admission of Dr. Norwood's report into evidence, and she responded that she did not. A.R. 73.

Ellsworth argues that by denying the subpoena request without explanation, the ALJ violated provisions of the Social Security Administration's Hearings, Appeals, and Litigation Law Manual directing judges to notify and provide an explanation to claimants when denying a subpoena. Ellsworth does not cite to any authority to establish that that manual is binding on the Commissioner, or that it provides claimants with enforceable rights, such that a violation by itself entitles a claimant to relief. But Ellsworth also argues, without citing to any authority, that by depriving him of the opportunity to cross-examine Dr. Norwood, the ALJ violated his constitutional right to due process of law. In general, an explanation of the ALJ's reasoning is necessary for a reviewing court to properly evaluate his decision. In this case, however, the ALJ's decision to deny the subpoena request did not cause Ellsworth a constitutional injury, so his failure to explain that decision is immaterial.

"Cross-examination is . . . not an absolute right in administrative cases." *Butera*, 173 F.3d at 1057 (quoting *Central Freight Lines, Inc. v. United States*, 669 F.2d 1063, 1068 (5th Cir. 1982)) (finding the ALJ did not err in denying subpoena request). Where an adverse medical report is introduced after a hearing and a claimant does not have the opportunity to cross-examine its author or present

rebuttal evidence, the claimant's right to due process may have been violated. *See,*
*e.g., Lonzollo v. Weinberger*, 534 F.2d 712, 714 (7th Cir. 1976). But this is not such a
case. As the Commissioner notes, the ALJ proffered Dr. Norwood's report to
Ellsworth's counsel and offered to schedule a supplemental hearing at Ellsworth's
request. Ellsworth did request a supplemental hearing, and he introduced
additional evidence at that hearing, presumably in part to rebut the evidence
presented in Dr. Norwood's report. But he did not identify any deficiencies in the
report itself. Moreover, Ellsworth explicitly agreed to the admission of the report
without objection at the hearing. Ellsworth did not explain at the hearing, and does
not explain now, how cross-examination of Dr. Norwood was necessary for the full
presentation of his case, or how the lack of opportunity to cross-examine Dr.
Norwood violated his right to due process.

The ALJ failed to explain why he denied Ellsworth's request to subpoena Dr.
Norwood, and that was an error. But his denial did not violate Ellsworth's right to
due process, and Ellsworth does not provide any other reason to disregard Dr.
Norwood's opinion. The ALJ noted that Dr. Norwood examined Ellsworth, he
presented his findings in a detailed report, and his findings were consistent with
the record. The ALJ's decision to assign great weight to Dr. Norwood's opinion is
supported by substantial evidence.

### B.    Dr. Harper's Opinion

The ALJ assigned "little weight" to the medical opinions of Dr. Harper, citing
inconsistencies between those opinions and the record. Ellsworth argues that the

ALJ erred in discounting Dr. Harper's opinions, and that he failed to provide an adequate explanation of that decision. Ellsworth argues that Dr. Harper was a treating physician, whose opinion was entitled to controlling weight so long as it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (quoting 20 C.F.R. § 404.1527(d)(2)). The opinions of treating physicians are afforded such weight because they are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "An ALJ who does not credit such an opinion must offer good reasons for doing so and must address the appropriate weight to give the opinion." *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016)

The Commissioner first argues that Harper was not Ellsworth's treating physician. A treating physician is one "who provides medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502. An "ongoing treatment relationship" exists when the "medical evidence establishes" that the claimant "see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [his] medical condition." *Id*. The

Commissioner says that Ellsworth could not have had an ongoing treatment relationship with Dr. Harper, because Ellsworth had seen him only once when Dr. Harper issued the first medical opinion (in 2012), and the purpose of the visit was for Dr. Harper to write a letter to Social Security. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) ("We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability."). The Commissioner also points out that Dr. Harper's second opinion, issued in 2014, does not explicitly indicate that Dr. Harper himself, rather than someone else in his office, examined Ellsworth. The Commissioner cites to various parts of the record in support of her argument, but that argument fails because the ALJ did not make the finding that Dr. Harper was not a treating physician. A reviewing court "must judge the propriety of [the agency's determination] solely by the grounds invoked by the agency[,]" *SEC v. Chenery*, 332 U.S. 194, 196 (1947). The ALJ referred to Dr. Norwood and two other doctors as "consultative examiners," and he referred to a few others as "non-examining physicians." A.R. 30. The ALJ assigned great weight to the opinions of those doctors, but likely did not intend those categories to encompass treating physicians. The ALJ referred to each of Dr. Harper's medical opinions, which took the form of letters addressed "To Whom It May Concern," as a "medical source statement," and he did not explicitly categorize Dr. Harper. He may have considered

him a treating physician, or he may not have, but he did not convey those thoughts to anyone. The Commissioner may not fill in this analysis after the fact.

That is not to say, however, that the ALJ erred in giving Dr. Harper's opinion little weight, whether or not he considered Dr. Harper a treating physician. An ALJ can decide against giving a treating physician's opinion controlling weight, so long as he gives "good reasons" for doing so, after considering: "(1) whether the physician examined the claimant, (2) whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations, (3) whether other medical evidence supports the physician's opinion, (4) whether the physician's opinion is consistent with the record, and (5) whether the opinion relates to the physician's specialty." *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016) (citing *Larson*, 615 F.3d at 749). This "checklist is designed to help the administrative law judge decide how much weight to give the treating physician's evidence. When he has decided how much weight to give it, there seems no room for him to attach a presumptive weight to it." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). A reviewing court upholds "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (quoting *Luster v. Astrue*, 358 F.App'x. 738, 740 (7th Cir. 2010)).

Ellsworth faults the ALJ for not explicitly referring to those factors when he gave Dr. Harper's opinion little weight, but what matters is "whether the ALJ sufficiently accounted for the factors in 20 C.F.R. § 404.1527 and built an 'accurate

and logical bridge' between the evidence and his conclusion." *Schreiber v. Colvin*, 519 F.App'x 951, 959 (7th Cir. 2013) (citations omitted). The ALJ's decision demonstrates that he was aware of and considered many of those factors, and he logically connects the evidence in the record to his determination of the weight given to Dr. Harper's opinion. For example, he was aware of the length of Ellsworth's relationship with Dr. Harper and the timing of their interactions. The ALJ explicitly noted that Ellsworth met with Dr. Harper on May 21, 2012, and explained Dr. Harper's medical findings as described in the 2012 letter.[5] He also explained the substance of Dr. Harper's second letter, issued on February 18, 2014 (though he did not specify that Dr. Harper had examined Ellsworth before writing it), and noted that it was issued within four months of Dr. Norwood's report.

Most importantly, however, the ALJ discussed the supportability of Dr. Harper's opinion and the inconsistencies between that opinion and the record. As noted above, Dr. Harper opined in 2012 that Ellsworth suffered from daily, incapacitating headaches, speech problems, fatigue, anxiety, weakness, numbness, and problems with walking, and that he should be on disability until his headaches were under control or he were trained for a new job. In 2014, Dr. Harper opined that Ellsworth still suffered from many of the same conditions, but was permanently disabled because he suffered from "severe post-stroke intractable debilitating headaches which are daily, ongoing, and incapacitating/debilitating." A.R. 567. Dr. Harper explained that headaches are common among post-stroke

---

[5] Dr. Harper's letter actually says that Ellsworth was seen in his office on May 25, 2012, but the letter is dated May 21, 2012. A.R. 427.

patients and often do not respond to treatment. A.R. 567. He also said that Ellsworth "is on several chronic medications to try to control them without much relief," and that the side effects of those medications made driving dangerous. A.R. 567. But that statement conflicted with Ellsworth's testimony in the 2014 hearing just a few weeks later, as well as the 2013 hearing, that he took only over-the-counter medication for his headaches.[6] The ALJ noted both that conflict and the conflict between Dr. Harper's statement and Dr. Norwood's report, filed just four months earlier, that Ellsworth took no medication at all but could still work. He also suggested that Dr. Harper's opinions were inconsistent with each other, because the 2012 opinion indicated that Ellsworth's post-stroke headaches were treatable, but the 2014 opinion concluded that they were not, without referring to any new evidence other than the supposed ineffectiveness and side effects of the medication that Ellsworth did not actually take.

An ALJ may discount a treating physician's medical opinion if it "is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)). The ALJ explained that he discounted Dr. Harper's opinions because

---

[6] There is some other evidence in the record (that the parties do not address in the briefs) indicating that Ellsworth took some prescription medications in 2012 or 2013. A.R. 50, 58, 307. But that evidence does not eliminate the conflict between Ellsworth's other testimony that he took only over-the-counter medications and Dr. Harper's statement that Ellsworth was taking medications with severe side effects. It was not an obvious error by the ALJ to consider the conflicting evidence when weighing Dr. Harper's opinions.

they conflicted with Ellsworth's testimony and with Dr. Norwood's report, and because they were inconsistent with each other. Substantial evidence supports his decision to give little weight to Dr. Harper's opinions, and he provided an adequate explanation for that decision.[7]

Ellsworth does not suggest that his statements at the hearing or his statement reported by Dr. Norwood were inaccurately recorded or miscommunicated, but he claims that the inconsistency in his statements can be explained in two ways. First, he claims that the ALJ misunderstood the timing of the statements. He says that Dr. Harper wrote his first opinion in 2012, and that Ellsworth made his statements in 2013 and 2014. The Commissioner does not respond, but Ellsworth's clarification is inaccurate. It was Dr. Harper's 2014 opinion, not his 2012 opinion, that said that Ellsworth was taking medication to try to control his headaches without much relief. That statement *was* inconsistent with Ellsworth's testimony at the first hearing on July 18, 2013, and at the second hearing on March 5, 2014, and with his statements as reported by Dr. Norwood on October 31, 2013. Ellsworth's second explanation of the inconsistency is that he did not take his prescription medication because he could not afford it. He did testify to that fact at both hearings (A.R. 58, 81), and it explains his noncompliance with his treatment plan. But Ellsworth's inability to pay for treatment does not resolve the

---

[7] The ALJ did not address the frequency of Ellsworth's migraines (and there was no dispute that Ellsworth suffered from migraines). This is a weakness in the ALJ's decision. *See Moon v. Colvin*, 763 F.3d 718, 721–22 (7th Cir. 2014). But the ALJ could still discount Dr. Harper's opinion based on the identified inconsistencies, even if the gulf between the inconsistent information about the severity of the migraines and the prescription medications was not vast—an inconsistency is nevertheless a logical reason to weigh one piece of evidence less than another.

inconsistency between Dr. Harper's statement that he was taking medication—medication that caused side effects and was not sufficiently effective—and Ellsworth's statements that he was not taking the medication prescribed to him.

Ellsworth also complains that the ALJ did not explicitly mention Dr. Harper's findings related to recent MRI results. "The ALJ need not, however, discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). Dr. Harper opined that an MRI scan showed damage consistent with Ellsworth's history of having a stroke and with his disability claims. A.R. 567. He also said that "[c]hronic daily headaches after strokes are a well-known phenomenon and can be very debilitating." A.R. 567. The ALJ did not discuss the MRI results, but he did mention the ultimate finding that Ellsworth had a history of a stroke, citing to the exhibit containing Dr. Harper's 2014 opinion and the MRI results. There is no question that Ellsworth had a stroke, and it is well-documented that he had been experiencing headaches. The MRI's confirmation of those facts does not speak to the issue being addressed by the ALJ— the extent to which the intensity, persistence, and effects of Ellsworth's headaches and other symptoms limit his functioning. Nothing in the record suggests that an MRI can confirm either the frequency or severity of post-stroke headaches. The ALJ's omission of the MRI results does not require remand or reversal of his decision.[8]

---

[8] Ellsworth mentions in his brief that other records of his second visit with Dr. Harper exist, and that they were not presented to the ALJ. But he does not explain why they were

## C.    Credibility Assessment

The ALJ also discounted Ellsworth's own subjective complaints that he suffered from a number of physical ailments that prevented him from working. "An ALJ must consider subjective complaints of pain if a claimant has established a medically determined impairment that could reasonably be expected to produce the pain." *Moore*, 743 F.3d at 1125 (quoting *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004)). But "[a]n ALJ may disregard a claimant's assertions of pain if he validly finds her incredible." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). In making a credibility determination, an ALJ must consider the entire case record, including "elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, 'functional limitations,' and treatment (including medication)." *Id.* A reviewing court may overturn a credibility finding only if "patently wrong." *Carradine*, 360 F.3d at 758. Ellsworth argues that the ALJ committed legal errors in assessing his credibility.

The ALJ acknowledged that Ellsworth complained of "migraine headaches, shortness of breath, fatigue, weakness, problems with balance, lack of concentration, and problems swallowing." A.R. 26. He also noted that Ellsworth said that he had difficulty walking and driving, and that sunshine and vibrations bothered him. A.R. 26. But the ALJ made a partially adverse credibility finding as

---

not presented, or how they would have affected the ALJ's decision. He also did not submit those records on this motion, so I do not consider them (or their omission) in reviewing the ALJ's decision.

to Ellsworth's statements about the intensity, persistence, and limiting effects of those symptoms. A.R. 27. The ALJ provided four reasons for this finding: (1) "the medical records reflect basically normal physical examinations in regards to his status post atrial septal defect;" (2) Ellsworth's weakness and general incapacitation had not changed in intensity in a year; (3) Ellsworth's "irregular compliance with taking prescription medication for his headaches related to his cerebrovascular disease;" and (4) Ellsworth's "continued ability to perform activities of daily living." A.R. 30.

Ellsworth first argues that the ALJ failed to address whether Ellsworth had an underlying impairment that could reasonably be expected to produce the symptoms alleged. That is incorrect. As Ellsworth himself mentions earlier in his brief, the ALJ found that Ellsworth did have medically determinable impairments that could reasonably be expected to cause the alleged symptoms. A.R. 27. Ellsworth also argues that the ALJ's explanation of his credibility assessment is inadequate, but discusses only the ALJ's failure to explicitly address Dr. Harper's statement that the 2014 MRI results are consistent with Ellsworth's disability claims. As explained above, the ALJ did incorporate this line of evidence, if not the MRI results in particular.

Ellsworth does not address any of the reasons the ALJ did provide for discounting his testimony,[9] and the Commissioner argues that the ALJ's explanation is sufficient, focusing on the ALJ's first reason—that the physical

---

[9] Ellsworth has forfeited any argument that the ALJ's reasons were erroneous.

examinations have yielded essentially normal results. The Commissioner states that the discrepancy between the medical evidence in the record and Ellsworth's complaints suggests that Ellsworth is exaggerating all of his symptoms. Though the ALJ did not explicitly make that finding with respect to Ellsworth's headaches, his reasoning is apparent from the rest of the decision. The ALJ discussed the findings of several medical professionals who had examined Ellsworth, emphasizing the contrast between Ellsworth's complaints to those doctors and the relatively normal results of his physical examinations. With respect to Ellsworth's weakness, numbness, fatigue, mobility, and speech issues, the examining doctors found the symptoms less severe than Ellsworth had reported. "Although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not supported by the medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones*, 623 F.3d at 1161; s*ee also McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (approving of an ALJ's credibility determination in light of evidence that the claimant had been exaggerating her symptoms to her doctor, despite the fact that the ALJ provided two other improper reasons for discrediting her testimony). The ALJ provided an explanation as to why he found Ellsworth's testimony incredible, and Ellsworth does not explain how it is patently wrong. Therefore, the ALJ's credibility finding will not be overturned.

### D. Residual Functional Capacity

"In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The ALJ said that he reviewed the entire case record, including objective medical evidence, medical opinion evidence, and Ellsworth's testimony. He discussed the record and determined a residual functional capacity that incorporated certain limitations. Ellsworth says that the ALJ failed to provide a sufficiently detailed discussion of his residual functional capacity determination and did not resolve inconsistencies in the evidence. But Ellsworth does not elaborate on these arguments or provide any further explanation as to how the ALJ's residual functional capacity determination is lacking. To the extent Ellsworth intended to raise arguments related to the residual functional capacity determination (other than those already addressed), those arguments are waived. *See Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Exp., Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not developed in any meaningful way are waived."). The ALJ's determination of Ellsworth's residual functional capacity will not be disturbed.

### E. Vocational Expert

To determine whether there exist jobs that Ellsworth could perform in spite of his limitations, the ALJ articulated Ellsworth's residual functional capacity:

> "If I were to find the claimant of capable of performing work at the sedentary level of exertion, I find that he would be precluded from

climbing ladders, ropes, or scaffolds and could occasionally climb, frequently balance; occasionally stoop, kneel, crouch, but never crawl; he could not operate a motor vehicle as part of a job duties; he could not work around unprotected heights or dangerous machinery and would be limited to the performance of simple one and two-step procedures that involve non-complex tasks."

A.R. 83. The ALJ then confirmed with the vocational expert that a person with the restrictions listed above, and with the additional restriction against jobs that have production quotas, would not be able to perform Ellsworth's past jobs, but would be able to perform a significant number of jobs that exist in the national economy. A.R. 83–84. The ALJ then asked the vocational expert if Ellsworth could work those jobs if his subjective testimony were credited. A.R. 83–84. The vocational expert understood that to refer to Ellsworth's testimony that his headaches and other symptoms required that he lie down several times a day, and the vocational expert testified that that behavior would conflict with the demands of those jobs. A.R. 84.

Ellsworth says the ALJ erred by failing to include his headaches, difficulty walking, and other problems in the questions he posed to the vocational expert. He also argues that the ALJ erred in disregarding the vocational expert's testimony that if Ellsworth's subjective testimony regarding his pain, weakness, fatigue, and anticipated absenteeism were credible, he would not be able to perform any available jobs. "[T]o the extent the ALJ relies on testimony from a vocational expert, the question posed to the expert must incorporate all relevant limitations from which the claimant suffers." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). But "the ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Schmidt*, 496 F.3d at 846.

Given that the ALJ found Ellsworth's testimony only partially credible, it makes sense that the ALJ excluded some of the substance of that testimony from his question to the vocational expert. And as the Commissioner points out, the ALJ did account for some of the problems to which Ellsworth testified, such as his weakness and difficulty walking, by limiting him to sedentary work with a number of postural and environmental limitations. The ALJ posed appropriate hypothetical questions to the vocational expert, and the ALJ's finding that Ellsworth remained capable of performing full-time, sedentary work is connected to the record by way of a logical bridge based on credibility determinations. Substantial evidence supports the decision.

## F.    Later Developments

When the ALJ issued his decision, Ellsworth had just turned 48 years old. He is now over 50, and he claims that because he is a high school graduate limited to unskilled sedentary work, he would now be considered disabled under a different set of guidelines—the Medical Vocational Guidelines, 20 C.F.R. Part 4, subpart P, App. 2. But he does not argue that the ALJ erred by not considering those guidelines or treating Ellsworth as a 50-year-old under those guidelines, so his argument is unrelated to review of the ALJ's decision and is therefore disregarded. He also says new medical records are "enclosed" with his brief, and asks that those documents be added to the record. But there are no additional records attached to the brief or filed on the docket, and even if there were, they are not subject to review. *See Eads v. Sec'y of Dep't of Health & Human Servs.*, 983 F.2d 815, 817 (7th

Cir. 1993) ("Evidence that was not before the ALJ will not be considered upon judicial review."). The ALJ's decision will not be reversed based on the later events that Ellsworth identifies.

## IV.    Conclusion

Ellsworth's motion, [24], is denied, and the Commissioner's motion, [33], is granted. The ALJ's decision is affirmed. Enter judgment in favor of the Commissioner and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: September 11, 2017